IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 13, 2013 Session

QAWI NUR, aka DARRIUS JAMES v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 02-06231     W. Otis Higgs, Jr., Judge

No. W2013-00434-CCA-R3-PC  - Filed January 22, 2014

The petitioner, Qawi Nur, also known as Darrius James, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel.  After review, we affirm the denial of the petition.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Gregory D. Allen (on appeal) and Juni Ganguli (at hearing), Memphis, Tennessee, for the appellant, Qawi Nur, aka Darrius James.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Alexia Crump, Anita Spinetta, Charles Summers, and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

OPINION

FACTS

The petitioner was convicted by a Shelby County Criminal Court jury of one count of first degree felony murder and one count of second degree murder, which the trial court merged into one conviction for first degree felony murder. State v. Qawi Nur, a/k/a Darrius James, No. W2004-01259-CCA-R3-CD, 2005 WL 1467904, at *1 (Tenn. Crim. App. June 21, 2005), perm. app. denied (Tenn. Oct. 24, 2005).  He was sentenced to life imprisonment without the possibility of parole. Id.  This court affirmed his convictions on direct appeal, and the Tennessee Supreme Court denied permission to appeal. Id.

The underlying facts of the case were recited by this court on direct appeal as follows:

Christie Lee Holmes was the girlfriend of the victim, David Romanoli. Immediately prior to the shooting, Ms. Holmes, the victim, the victim's younger brother, James, and his friend, Steven Inglis, were sitting in a bathroom in the victim's second floor apartment smoking marijuana. The group heard someone kick the front door open. The victim left the bathroom, and Ms. Holmes heard him call out, asking who the intruder was and what he or she wanted.

Ms. Holmes followed the victim as he ran down the stairs after the intruder. When she reached the ground floor, Ms. Holmes saw a black car drive by with its doors open. A woman was running after the car, trying to flag it down. Ms. Holmes chased the woman. The woman stopped, and an African-American man stepped out of some bushes near the apartment building. Ms. Holmes said that the woman told the man "to shoot [Ms. Holmes], shoot her, pop a cap in her ass, too." Ms. Holmes saw that the man was unarmed and demanded his name. The man and woman ran away.

Ms. Holmes identified [the petitioner] and Melissa Swift from photo line-ups as the man and woman she encountered outside the victim's apartment building. Ms. Holmes said that [the petitioner] was wearing a white shirt, baggy jeans, and tennis shoes when she saw him. Ms. Holmes did not see the shooting nor did she hear gunshots.

David Barnwell, the victim's neighbor, said that he heard gunshots and stepped out onto his second floor patio. He saw a woman run past his apartment followed by an African-American man wearing baggy jeans and a red baseball cap.

Officer Hope Bebout with the Memphis Police Department found a red cap in a bush next to the apartment building. A pair of red nylon sweat pants and a bandana were also found behind the building. Officer Robert Harris found a .38 caliber revolver in a bush next to the apartment building's back stairwell. Officer Sherman Bonds said that the .38 caliber revolver had four spent casings and two live rounds. Heath Barker, a special agent with the Tennessee Bureau of Investigation, testified that the bullet removed from the victim's body during the autopsy was fired from the .38 caliber revolver found at the crime scene.

Nina Sublette, a nurse practitioner, took a blood sample from [the petitioner] for the purpose of DNA sampling. Special Agent Lawrence James attempted to obtain a DNA sample from the clothes found at the crime scene. Agent James was unable to secure a sample from the pants or bandana. The DNA sample taken from the red cap contained DNA from two contributors, one of whom was possibly [the petitioner]. The DNA analysis indicated that the probability of obtaining that mixed profile from the African-American population is approximately one in eight. Although the DNA sample did not conclusively match [the petitioner's], he could not be excluded as a contributor.

Dr. Teresa Allen Campbell performed the victim's autopsy. Dr. Campbell said that the cause of death was a gunshot wound to the right side of the chest. The bullet struck the victim's left lung and aorta and did not exit the body. There was no soot around the wound indicating that the shooter was more than two feet from the victim when the gun was discharged.

Melissa Swift testified that she was indicted for first degree felony murder in connection with the victim's shooting, but pled guilty to the lesser included offense of facilitation of first degree felony murder. On the afternoon of the shooting, Ms. Swift met Coty Childress and Jennifer Mohrhoff at a gas station, and invited the women to her apartment to smoke marijuana. When the marijuana was gone, Ms. Childress said that the victim had a supply of marijuana and suggested that the group rob him. Ms. Swift called [the petitioner] and asked him to go with the women. The three women picked [the petitioner] up at his apartment and then drove to the victim's apartment building.

Ms. Swift said that she and [the petitioner] went upstairs and knocked on the victim's front door. No one answered, and the two returned to the car. [The petitioner] and Ms. Childress then went up the stairs while Ms. Swift waited outside. Ms. Childress knocked on the door, and, once again, no one answered. [The petitioner] kicked the front door down. Ms. Childress and [the petitioner] went inside the apartment but ran back out in a few seconds. [The petitioner] pushed Ms. Childress into Ms. Swift as he ran down the stairs. Ms. Childress hurt her ankle and ran toward the car. Ms. Swift said a man came down the stairs behind [the petitioner] and Ms. Childress.

Ms. Swift ran around the corner of the apartment building. She saw [the petitioner] coming toward her with a gun in his hand. Ms. Swift said that

she heard gunshots but did not see [the petitioner] shoot the victim. [The petitioner] took off some of his clothes and hid the clothes and gun behind the apartment building. Ms. Swift said that she and [the petitioner] got back into the car and returned to Ms. Swift's apartment. When he got into the car, [the petitioner] said, "I think I shot him." Ms. Swift said that she was not armed that afternoon.

On cross-examination, Ms. Swift said that she saw Ms. Holmes as she ran away from the scene. Ms. Swift said she initially thought that the victim had fired a gun. She did not see [the petitioner's] gun when he first got in the car prior to the incident. [The petitioner] left Ms. Swift's apartment, and Ms. Swift and her friends ate dinner at a local restaurant.

Ms. Mohrhoff said that she was indicted for facilitation of first degree felony murder in connection with the shooting. Ms. Mohrhoff generally confirmed Ms. Swift's description of the sequence of events that afternoon. Ms. Mohrhoff said that she and her friends, April Smith and Coty Childress, saw Ms. Swift and her friend, Dara Wiginton, at a gas station, and the group went to Ms. Swift's apartment to smoke marijuana. Ms. Mohrhoff said that Ms. Childress told them where they could get some more drugs. Ms. Mohrhoff drove Ms. Smith's car first to [the petitioner's] apartment and then the victim's. Ms. Wiginton and Ms. Smith stayed behind at Ms. Swift's apartment.

Ms. Mohrhoff said that Ms. Swift and [the petitioner] went to the victim's apartment on the second floor and knocked on the door. When no one answered the knock, Ms. Swift and [the petitioner] came back downstairs. Ms. Childress and [the petitioner] then went upstairs and knocked on the door. Ms. Mohrhoff said that [the petitioner] came running down the stairs followed by Ms. Childress. The victim chased Ms. Swift and [the petitioner] around a corner of the apartment building, and Ms. Mohrhoff heard gunshots. She and Ms. Childress drove off.

Ms. Mohrhoff said that she had trouble driving because she was so nervous, and pulled the car over to the side of the street. She saw Ms. Swift and [the petitioner] run up behind the car. Both of them got in, and Ms. Swift directed Ms. Mohrhoff to drive back to Ms. Swift's apartment. [The petitioner] said that he had fired his gun but did not know whether or not he had shot the victim.

Ms. Mohrhoff said that [the petitioner] was wearing red pants and a tee shirt when he first got into the car, but she did not remember whether or not he was wearing a hat. Ms. Mohrhoff remembered seeing another woman at the crime scene that afternoon. Ms. Mohrhoff said that news of the shooting was on television that night, but the license plate number of the car reportedly seen at the scene was not Ms. Smith's. The group ate dinner at a local restaurant and then returned to Ms. Swift's apartment. Ms. Mohrhoff's next-door neighbor called and said that the police had Ms. Smith's license plate number. The police were waiting at Ms. Mohrhoff's apartment when she, Ms. Smith, and Ms. Childress arrived.

Id. at *1-3.

Thereafter, the petitioner filed a timely *pro se* petition for post-conviction relief and, after the appointment of counsel, two amended petitions. Among the allegations raised in his petitions, the petitioner alleged, as on appeal, that he received the ineffective assistance of counsel because counsel failed to contact alibi witnesses, failed to investigate inconsistencies in the statements of his accomplices, failed to request independent DNA testing, and argued in closing argument that the petitioner was present in the area during the time of the murder.

The post-conviction court conducted an evidentiary hearing, at which the petitioner's trial counsel testified that she had worked in the public defender's office for over twenty-one years. She said that the petitioner had a previous conviction for second degree murder. Because the State filed a notice of intent to seek the death penalty, the capital case team, of which counsel was a part, worked on the petitioner's case. Counsel recalled that she filed numerous motions on the petitioner's behalf.

Counsel stated that the State's case was based on the testimony of the victim's girlfriend, Christie Holmes, and two of the petitioner's accomplices, Melissa Swift and Jennifer Mohrhoff, as well as "DNA testing that could not exclude [the petitioner] as someone who had worn the clothing that had been discarded . . . running away from the scene." Swift pled guilty to facilitation of first degree murder prior to the petitioner's trial, so counsel had no problem interviewing her. Counsel or a member of the defense team also interviewed several other witnesses from the apartment complex. Counsel was unable to interview Mohrhoff because her case was pending, and counsel was not sure whether Holmes was interviewed. However, counsel said that she had a copy of all their statements prior to trial. Counsel stated that Mohrhoff identified the petitioner out of a single photograph. She said that Coty Childress, another accomplice who did not testify at trial, identified the petitioner from a single photograph as well. Counsel was not sure if Childress was

interviewed. Counsel filed motions to suppress the photographic identifications. Counsel cross-examined Mohrhoff and Holmes at a hearing to suppress their identifications.

Counsel testified that she interviewed the State's expert before trial and, after interviewing him, made the tactical decision to not call her own expert or seek independent testing. She was concerned that an independent test could return more incriminating results than the State's test, which she would be obligated to turn over, and because there were eyewitnesses who placed the petitioner at the scene. Counsel stated that the DNA evidence against the petitioner was not "real hard clad" and easily allowed her to argue reasonable doubt.

Regarding the alibi issue, counsel recalled that the petitioner initially told her that he was doing drugs and having an orgy with the three female accomplices on the morning of the crime and then he passed out and woke up around 11:00 p.m. or midnight. He said that a couple of days later he decided to go to New Orleans. Counsel recounted that the petitioner later changed his story and said that he was in New Orleans at the time of the crime. The petitioner gave her the name of Charrel Reed to call in New Orleans to confirm his story, and counsel or someone in her office attempted to contact Reed but was ultimately unable to confirm the petitioner's story. Moreover, by the time of trial, the petitioner was no longer insisting on an alibi defense. Their defense at trial was that the petitioner was not the shooter, "[o]r truthfully more trying to blow holes in the State's case." She said that, at trial, she attempted to discredit the State's witnesses and tried to raise doubt as to whether the petitioner was at the scene or had a gun. Other than Reed's name, the petitioner gave her no other names of alibi witnesses.

Regarding closing argument, counsel stated that she had no specific recollection of what she said but acknowledged that the transcript showed that in her closing argument she stated that the petitioner was present at the scene with the three accomplices and that he ran away. However, she explained that what she says in closing argument depends on the facts that come out at trial and that "you can't really argue something that is completely contrary to the facts that have come in[.]" Counsel said that, because eyewitnesses placed the petitioner at the scene, possibly her strategy was to agree that he was at the scene but not with a gun or involved in the incident.

The petitioner admitted that he had a prior conviction for second degree murder and that counsel informed him that the State was seeking the death penalty. He testified that he was arrested for the present crime in New Orleans and was represented by counsel and members of the Capital Defense Team of the Shelby County Public Defender's Office. He recalled that he met with counsel or a member of the defense team five or six times in the jail, in addition to meetings on several court dates. The petitioner admitted that his defense

team interviewed witnesses and discussed the results of their investigation with him. He was given a copy of the discovery package but believed that it was missing some pages. He shared his concerns regarding the missing material via several letters to counsel. He also tried to have counsel removed from his case. The petitioner said that he asked his lawyers to challenge the DNA evidence against him and that was the source of his disagreements with counsel and the defense team. He could not recall what they told him as to the reason for not retaining an independent DNA expert.

The petitioner acknowledged that counsel attempted to challenge the witnesses' identification of him, which was the strongest part of the State's case. However, he complained that counsel did not prepare a defense and that "her idea of challenging the identification [by] asking questions" was inadequate. He also complained that, in closing argument, counsel told the jury that he was "present at the scene and basically participated with the girls." He contended that there was no corroboration that he was at the scene and, thus, counsel's stating in closing argument that he was at the scene was ineffective. On cross-examination, the petitioner asserted he was not at the scene but admitted that no one testified at the hearing in support of that contention.

The petitioner testified that he told counsel that his defense was that he "was not there," and that he "always maintained actual innocence." He told counsel that he believed he knew who committed the crime, but he did not provide a name at the hearing. The petitioner admitted that he knew the co-defendants through his younger stepbrother and was friendly with them. The petitioner claimed that he told counsel that he was at a friend's apartment in Memphis at the time of the crime, which was not in the apartment complex where the murder occurred. He said that he also gave counsel the names of his potential alibi witnesses, but he did not know where those people were presently located. The petitioner insisted that counsel was confused when she testified that he told her two different versions of events. He said that he told her where he was on the day of the crime and that he "subsequently left and went to New Orleans on a trip that [he] had planned previously."

On cross-examination, the petitioner acknowledged that he did not have any witnesses who could say that he was not at the scene of the crime. However, he claimed that he told counsel that he was at "Derrick's" apartment at the time of the crime but acknowledged that Derrick was not present at the evidentiary hearing. The petitioner stated that he "was leaning to testify" at trial but decided not to based on the advice of counsel. He admitted that, since the trial, he had not consulted a DNA expert to testify that there were tests that should have been done.

Following the hearing, the post-conviction court entered an order denying relief. The court found no merit in any of the petitioner's allegations of ineffective assistance of counsel

-7-

and that the petitioner failed to establish that counsel was ineffective or that he was prejudiced by counsel's representation.

## ANALYSIS

On appeal, the petitioner argues that he received the ineffective assistance of counsel because counsel: (1) failed to contact his alibi witnesses; (2) failed to investigate inconsistencies in his accomplices' statements; (3) failed to request independent DNA testing; and (4) argued in closing argument that the petitioner was present in the area during the time of the murder.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## I. Alibi Witnesses

The petitioner first contends that he received the ineffective assistance of counsel because counsel failed to contact his alibi witnesses. The petitioner asserted at the evidentiary hearing that he was passed out in someone's apartment at the time of the crime but admitted that he could not provide the name of anyone who could vouch for his alibi. Counsel testified that the petitioner gave her the name of a person in New Orleans, who was either not found or unable to provide an alibi, but did not give the name of any alibi witness to support his contention that he was passed out in Memphis at the time of the crime.

The post-conviction court found that the petitioner failed to prove this allegation because he admitted at the evidentiary hearing that he could provide no witness that would say he was not present at the crime scene. To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Accordingly, we discern no deficiency in counsel's performance or any resulting prejudice.

## II. Accomplices' Statements

The petitioner argues that he received the ineffective assistance of counsel because counsel failed to investigate inconsistencies in the statements of his accomplices. By referring this court to his amended petition, the petitioner elaborates that the "inconsistencies" were in the statement of Coty Childress and the "identical" statements of Jennifer Mohrhoff and Melissa Swift, detailing who was present at Swift's house and how the petitioner came to be with them. However, an examination of the record before this court does not reveal what statement, if any, Coty Childress gave to the police, and no proof was developed at the evidentiary hearing on this matter. Thus, there is no way to determine whether counsel performed deficiently or whether the petitioner was prejudiced because of any failure to investigate said inconsistencies. The petitioner suggests in his brief that counsel performed deficiently by not challenging the photographic identification of him as being tainted "based on inconsistent statements" and by not exploring the relationship between the victim's girlfriend, Christie Holmes, and Coty Childress, but he also presented no proof in support of or developed such issues.

## III. Independent Testing

The petitioner argues that he received the ineffective assistance of counsel because counsel failed to request independent DNA testing of a red cap found at the scene. Counsel testified that she made the tactical decision to not call her own expert or seek independent testing because she was concerned that an independent test could return more incriminating results than the State's test, which she would be obligated to turn over, and because there were eyewitnesses who placed the petitioner at the scene. Counsel stated that the DNA evidence against the petitioner was not "real hard clad" and easily allowed her to argue reasonable doubt. The post-conviction court accredited counsel's testimony and noted that its function was not to second guess tactical and strategic decisions concerning defense matters. The petitioner has, therefore, failed to prove that counsel performed deficiently. Moreover, the petitioner has not consulted with a DNA expert or provided any evidence to show that additional testing would have been beneficial and, thus, has not shown prejudice.

Along these lines, the petitioner also alleges that counsel failed to subject the firearm and other physical evidence retrieved from the scene to further testing. The petitioner presented no evidence on this issue at the evidentiary hearing to show that the failure to conduct further testing on these items prejudiced his case.

## IV. Closing Argument

The petitioner argues that he received the ineffective assistance of counsel because

counsel placed him at the scene of the crime in her closing argument. Review of the record of closing argument shows that counsel argued that the petitioner's accomplices were not credible and that no one testified that they saw the petitioner kick in the door of the victim's apartment. Counsel argued that the police investigation was deficient and that the State's case essentially rested on the two accomplices who had a reason to lie. Counsel pointed out that Melissa Swift had robbed someone with a handgun just two weeks prior to the offense in this case. Counsel argued that Swift and Mohrhoff "cooked it up together[,] [a]nd when it hit the fan, they decide to cut [the petitioner] loose. They decided to blame him." Counsel then acknowledged that the petitioner ran away, "[b]ut wouldn't you when something went bad . . . that you were with someone and it just went to hell and back? I'd run, too."

The post-conviction court found counsel's argument was a tactical decision based upon the circumstances of the case. The court noted that eyewitnesses and the proof developed over the course of trial placed the petitioner at the crime scene. The court stated that counsel "had to frame her closing argument according to the proof that comes out during trial." The court noted that counsel "had a clear understanding of the proof and testimony in this case, and she decided that it would be harmful to argue in closing something that is completely contrary to the facts presented." The court determined that counsel's decision to include a statement placing the petitioner at the scene "was reasonable because arguing to the contrary could diminish her credibility and hurt [the] [p]etitioner's defense." The court concluded that counsel's decision was "objectively reasonable under the circumstances" and that counsel did not render deficient performance. The record supports the post-conviction court's determination.

The petitioner contends that the facts of his case mirror those in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), where counsel was found to be ineffective for failing to utilize affidavits and testimony from witnesses that two other persons had openly discussed plans to kill the victim and were observed on several occasions making verbal threats and physical assaults against him. Id. at 462-63. This is contrary to the present case, where the only information that someone else committed the crime was from the petitioner's bare assertion at the evidentiary hearing that he believed he knew who committed the crime. The petitioner simply cannot show any deficiency or prejudice of the kind established in Burns.

Although he complains about counsel's closing argument, the petitioner has not shown that any other viable defense strategy was possible. The petitioner presented no witnesses at the evidentiary hearing and even admitted that he could produce none to support his assertion that he was alone in an apartment at the time of the crime. Counsel's argument was a reasonable approach to arguing a difficult set of facts, and the petitioner has shown no reasonable probability that, given the proof, any other argument would have had a better outcome.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.


_____
ALAN E. GLENN, JUDGE